Filed 08/22/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ERIN CAMERON,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LAS ORCHIDIAS<br>PROPERTIES, LLC,<br><br>    Defendant and Appellant. | B313971 consolidated with<br>B316033<br><br>(Los Angeles County<br>Super. Ct. No. 19STCV11918) |

    APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge.  Affirmed.
    Horvitz & Levy, David M. Axelrad and Shane H. McKenzie; Craig Mordoh for Defendant and Appellant.
    Campbell & Farahani and Frances M. Campbell and Nima Farahani for Plaintiff and Respondent.

_____

    Defendant and Appellant Las Orchidias Properties, LLC, (LOP) appeals the trial court's judgment in favor of Plaintiff and Respondent Erin Cameron (Cameron) on her causes of action for wrongful eviction and financial elder abuse following a bench

trial, the court's order denying LOP's motion for new trial, and the court's order awarding attorney fees and costs to Cameron.

LOP contends that (1) it was unfairly surprised at trial because the pleadings were inadequate to put LOP on notice of Cameron's claims; (2) Cameron failed to prove financial elder abuse; (3) the trial court erred in the admission and exclusion of evidence; (4) Cameron is not entitled to damages, or alternatively, her damages should be limited; and (5) the award of attorney fees and costs should be reversed.

We affirm the trial court's judgment, order denying the motion for new trial, and order awarding Cameron attorney fees.

## FACTS

Cameron moved into an apartment located at 6907 Bonita Terrace in Los Angeles in 1964. In 2003, LOP purchased Las Orchidias, the nine-unit apartment complex in which Cameron's apartment was located, for $2.4 million. Cameron's apartment and the other units in the complex were rent-stabilized.

Jon Padgett and Mark Howell were the controlling members of LOP. About two years after LOP purchased Las Orchidias, Padgett came to Cameron's door with a large dog and knocked loudly. When she opened the door he said "I want your unit." He did not greet her, he just said, "I want your unit." Cameron had "a real sense of -- anxiety, if not downright fear at that time." She did not know what to say. Cameron invited Padgett in. He offered to pay her $25,000 to leave her apartment. Cameron declined. She said, "I don't really care what you offer me, I don't want to move. I like it here. I love it here. It's home. I've been here many years. And, you know, I don't want to leave."

2

Cameron's heart was pounding. She testified, "I did not want to leave, and I was afraid."

On January 20, 2015, Padgett filed a Notice of Intent to Withdraw Units From Rental Housing Use under the Ellis Act with the Los Angeles Housing and Community Investment Department (the Department). The four units that LOP planned to remove from rental use included 1903–1905 Orchid Avenue and 6907 and 6907 ½ Bonita Terrace. At that time, LOP intended to convert the complex into condominiums. Padgett and Howell sent Cameron a letter informing her that her tenancy would be terminated on May 20, 2015. The letter included a notice of impending withdrawal and informed Cameron that she had the right to extend her tenancy by one year.[1] The notice also stated that if the unit was returned to the rental market within five years, LOP was required to offer Cameron the right to return to her apartment, provided that she requested such an offer in writing within 30 days.

Cameron timely invoked her right to extend her tenancy through January 20, 2016, and her right to return if the unit was reoffered for rent within five years.

_____

[1] Cameron was over 80 years old when she was informed that her tenancy would be terminated. Due to her age and the length of her tenancy, she was entitled to a one-year extension of her lease pursuant to LAMC 151.23, subdivision (B). (See *id*. ["If the tenant is at least 62 years of age or disabled (as defined in Government Code Section 12955.3) and has lived in his or her accommodations for at least one year prior to the date of delivery to the Department of the Notice of Intent to Withdraw pursuant to Subsection A. of this section, then the date of withdrawal of the accommodations of that tenant shall be extended to one year after the date of delivery of that Notice to the Department"].)

Cameron did not move out on January 20, 2016, and LOP initiated an unlawful detainer action against her. Ultimately, the parties entered into a stipulated judgment under which Cameron agreed to vacate the apartment by July 1, 2016.

Cameron left her home on June 29, 2016, after Padgett threatened that if she was not out by midnight it would be a "lockout eviction." Cameron was in "very bad shape emotionally," and could not accept that she was going to have to leave her home of 52 years. At the time that she left, Cameron's rent was $1,088.26 per month. Cameron rented a new, smaller apartment for $1,875 per month. She could not fit all of her belongings in the new apartment, so she rented a storage unit for $274 per month.

LOP had started construction on Las Orchidias in 2014, which continued through 2019. Padgett testified that Roger Henry performed managerial tasks at Las Orchidias and provided a presence to deter crime when the units were not rented. Padgett "had [Roger Henry] staying at the building throughout [construction]." Henry "stayed in all of the units," including Cameron's. LOP did not compensate Henry for his services, but instead "allowed him use of the property." Leases for 1903 and 1905 Orchid Avenue that were executed in January 2019 stated that Henry was authorized to manage Las Orchidias and listed his address as 6907 Bonita Terrace.

The construction costs went over-budget, so Padgett decided to put four units, including Cameron's apartment, back on the rental market. On July 26, 2018, LOP filed with the Department a notice of intent to return the units located at 1903 and 1905 Orchid Avenue to the rental market. On August 30, 2018, LOP filed a notice of intent to return the units located at

4

6907 (Cameron's apartment) and 6907 ½ Bonita Terrace to the rental market. Edward Jacobs, who worked for the Department, wrote to LOP regarding its obligations, including the obligation to re-rent to displaced tenants. LOP, however, intended to rent exclusively to short-term tenants so that it could deliver the premises unoccupied to the eventual buyer, as an unoccupied property would command a higher price.

The Department notified the displaced tenants that their apartments would be returned to the rental market, and that they had the right to re-rent if they informed the Department and LOP that they intended to do so. Jacobs called Cameron to convey the news. Cameron was "thrilled" at the prospect of returning home, and timely notified LOP of her intent. James Boothby, who had formerly lived in the apartment above Cameron at 6907 ½ Bonita Terrace, also informed the Department and LOP of his intent to return to his apartment.

LOP's attorney sent Cameron a letter that stated: "Unfortunately, my client has decided not to offer the unit to you at this time. [¶] In accordance with Government Code Section 7060.2(b)(2), enclosed please find a check in the sum of $6,649.56, representing six months [*sic*] rent for the above unit. This constitutes full payment of any damages you may be entitled to for my client's failure to re-rent to you." A check was enclosed, dated June 20, 2018 in the amount of $6,649.56. Cameron did not cash the check. Receiving the letter made Cameron feel like she had been punched in the stomach. She was "literally sick at [her] stomach." Boothby received an identical letter (with the exception that his monthly rent and corresponding check were higher). Boothby negotiated with LOP and relinquished his right to re-rent in exchange for a payment of $14,000.

5

Padgett testified that LOP did not re-rent to Cameron because LOP "needed to maintain the building as an empty property" so it would be "a more valuable product." LOP's real estate agent estimated that Las Orchidias could sell for $14 million if delivered unoccupied. Padgett did not believe Cameron would leave when Las Orchidias sold because "if somebody's lived in a unit for as long as she has . . . she would not be amenable to leaving and meet our criteria that we were selling the building empty." Padgett did not feel that Cameron's right to return "would trump what [LOP's] plans were for the development." Las Orchidias was later sold unoccupied for $12.5 million.

Padgett conceded that he spoke to Jacobs who informed him that LOP could not avoid re-renting to Cameron by paying six months' rent. Jacobs said he would likely refer the matter to the city. Although this concerned Padgett, it did not ultimately affect his decision not to honor Cameron's right to return. Padgett conceded in testimony that payment of six months' rent was an admission that LOP had violated Cameron's right to return.

### Trial Court's Statement of Decision

The trial court concluded that LOP violated Los Angeles Municipal Code (LAMC) section 151.27 by refusing Cameron her right to reoccupy her apartment after it re-entered the rental market in 2018. "[Cameron] clearly and timely exercised her right of return, both in 2015 (Exhibit 4) and 2018 (Exhibit 8), and she was firmly told through [LOP's] attorney that her right of return was not going to be respected." The court found that LOP's letter refusing to re-rent the apartment to Cameron "was

6

designed to trick [Cameron] into believing that she had no viable recourse by way of court action", and that LOP "was trying to hood wink [Cameron] into believing that [LOP] had the right to deny [Cameron] her right to return and that any damages she could recover for this violation would be limited to $6,649.56". Under LAMC section 151.02, when a landlord receives services in lieu of rent it is no different than receiving rent. The trial court therefore found that LOP rented Cameron's apartment to Henry after she moved out on June 29, 2016. The leases for 1903 and 1905 Orchid Avenue showed that Henry was living in Cameron's apartment in February 2019. Moreover, Padgett's testimony that he had Henry staying at Las Orchidias during construction from 2014 through 2019 to house sit, "have a presence at the property," and perform managerial tasks while staying in the various units without compensation, led the court to find that Henry lived in Cameron's unit between June 30, 2016, and the date the property was sold in 2020.

The trial court concluded that "the same conduct, the refusal to re-rent to [Cameron], constitutes financial elder abuse." Cameron's "right to return to her apartment was a personal property interest that [LOP] took 'to a wrongful use' so it could house its manager/security guard in exchange for his services and ultimately sell the property vacant." The court concluded that it was "beyond dispute" that LOP knew its conduct was likely to harm Cameron, in light of the communications it received from the Department that its plan not to re-rent to Cameron was illegal, Cameron's age, and her assertion that she did not want to leave and would always assert her right to return. LOP's representations in the letter refusing to re-rent to Cameron misleadingly suggested that LOP could refuse to re-rent to her

7

although it could not, and its check for damages deceitfully suggested that she was entitled to no more.

The court awarded economic damages of $68,948.10, an amount equal to Cameron's rent and storage costs less the amount she would have been required to pay in rent for her former apartment had she re-rented it, for 65 months (her life expectancy). It awarded $250,000 in non-economic damages for the emotional harm Cameron suffered and would continue to suffer due to LOP's wrongful refusal to honor her right to return to her apartment. The court found that LOP's denial of Cameron's right to re-rent her apartment was "particularly cruel in light of the history between the parties." "[T]o hold out hope" to Cameron that she could return to her beloved home of over 50 years "and then snatch it away was devastating . . ." The court observed that it was apparent that Cameron continued to experience severe emotional distress while testifying. Finally, it found that an award of $250,000 in punitive damages was appropriate "given the reprehensibility of [LOP's] willful and conscious disregard of [Cameron's] rights and the need to deter future misconduct," as LOP had purchased another apartment building with the proceeds from its sale of Las Orchidias. The court cited LOP's attempt to mislead Cameron into believing that she was entitled to only $6,649.56 in compensation for violation of her right to re-rent as worthy of punitive damages. The court found LOP's assertion that it never re-rented Cameron's apartment not credible. It also found that LOP had the ability to pay the damages awarded, and the amount was not excessive.

***Motion for New Trial and Motion for Attorney Fees***

8

LOP moved for a new trial based on the arguments that (1) Cameron failed to plead her statutory claims; (2) LOP did not waive the defenses of advice of counsel and litigation privilege and should have been permitted to assert them; and (3) Cameron was either not entitled to, or the evidence was insufficient to support, the trial court's award of damages.

Cameron's counsel moved for attorney fees based on Cameron's successful financial elder abuse cause of action.

A hearing was held in which both motions were considered. The trial court observed that LOP's arguments in the motion for new trial were a re-hash of arguments that had been "presented to the court in the past in different phases of the proceedings," and that the court had considered and rejected the arguments previously. The court stated that it did not believe that LOP was surprised by either the theories that Cameron relied upon or the evidence supporting those theories. The court ruled that LOP had not provided any grounds for granting a new trial.

LOP's counsel argued that Cameron had not pleaded a claim for wrongful eviction based on the theory that LOP refused to re-rent to her. There was not sufficient evidence to support the finding that LOP re-rented Cameron's apartment to anyone.

Cameron's counsel responded that LOP's trial brief clearly stated that "'Cameron seeks damages from defendant for failure to rerent the premises to her prior to offering the unit for rent. . . .'" LOP was not surprised by the theory at trial.

The court denied the motion for new trial.

The court awarded Cameron attorney fees in the amount of $172,092.[2]

## DISCUSSION

### *The Ellis Act and the Los Angeles Rent Stabilization Ordinance*

"The Ellis Act (Act) sets forth the procedure by which a landlord may go out of business by removing rental units from the market." (*Drouet v. Superior Court* (2003) 31 Cal.4th 583, 589 (*Drouet*).) "Concerned about the possible adverse effect on rent control ordinances, the Legislature included provisions to insure against the removal of rental units for the sole purpose of circumventing rent control ordinances by, e.g., subjecting withdrawn accommodations to rent control if offered again for residential purposes. (Gov. Code, § 7060.2.) Also, the Act contains specific guidelines for public entities wishing to enact supplemental ordinances consistent with the Act. (Gov. Code, §§ 7060.2–7060.5.)" (*City of Santa Monica v. Yarmark* (1988) 203 Cal.App.3d 153, 168.) The Act provides that "if the units withdrawn from the market are subsequently offered again for rent, local governments may require landlords to offer the units at the lawful rent in effect at the time the notice of intent to withdraw was filed. (Gov. Code, § 7060.2, subd. (a)(1).) Local governments may also require landlords who intend to re-rent

---

[2] LOP's only argument with respect to attorney fees is that the judgment must be reversed, so the attorney fees must necessarily be reversed as well. It is therefore unnecessary to discuss the hearing in greater detail regarding attorney fees.

the units within 10 years after their withdrawal from the market to offer the units to displaced tenants first.  (*Id*., subd. (c).)" (*Drouet*, *supra*, 31 Cal.4th at p. 590.)  The Ellis Act preempts any local ordinance that """"duplicates, contradicts, or enters an area fully occupied by [the Act], either expressly or by legislative implication."""' [Citations.]' [Citation.]" (*San Francisco Apartment Assn. v. City and County of San Francisco* (2016) 3 Cal.App.5th 463, 475.)

The Los Angeles Rent Stabilization Ordinance ("LARSO") (LAMC, § 151.00, *et seq*.) was enacted "to regulate rents so as to safeguard tenants from excessive rent increases, while at the same time providing landlords with just and reasonable returns from their rental units."  (LAMC, § 151.01.)  Sections 151.22 through 151.28 of LARSO implement the provisions of the Ellis Act.  (LAMC, § 151.22.)  Pursuant to LAMC section 151.23, a landlord who wishes to withdraw units from rental housing use must file a notice of intent to withdraw with the Department in conformance with the requirements set forth in LAMC section 151.23.  The units may not be withdrawn less than 120 days after filing of the notice to withdraw.  (LAMC, § 151.23, subd. (B).)  If a tenant is at least 62 years old or disabled and has lived in the unit for a year or more, the tenant is entitled to an extension of one year after the notice of intent to withdraw if the tenant gives written notice of the tenant's entitlement to the extension to the landlord within 60 days of the filing of the notice to withdraw.  (LAMC, § 151.23, subd. (B).)  "If a landlord desires to offer for rent or lease a rental unit that was the subject of a Notice of Intent to Withdraw pursuant to the provisions of Subsection A. of Section 151.23, the landlord must file with the Department a Notice of Intention to Re-Rent Withdrawn Accommodations on a

11

form prescribed by the Department." (LAMC, § 151.24, subd. (A).) "Except as provided in Section 151.27 . . . the landlord shall not offer for rent or lease any unit from which a tenant or lessee was displaced for a period of thirty days following the filing of the Notice of Intention to Re-Rent Withdrawn Accommodations with the Department." (LAMC, §151.24, subd. (B).)

LAMC section 151.27 sets forth the re-rental rights of displaced tenants. As relevant here, LAMC section 151.27, subdivision (B), provides: "A landlord who offers accommodations for rent or lease not exceeding ten years from the date of withdrawal shall first offer to rent or lease each unit to the tenant or tenants displaced from that accommodation by the withdrawal, provided that the tenant or tenants requests the offer in writing within 30 days after the landlord has notified the Department of an intention to offer the accommodations again for residential rent or lease pursuant to the requirements of Section 151.24. The landlord shall be liable to any tenant or tenants who were displaced by that action for failure to comply with this subsection, for punitive damages in an amount that does not exceed the contract rent for six months."[3]

_____

[3] Cameron argues that she prevailed on her claim of wrongful eviction under both LAMC section 151.27, subdivision (A) and subdivision (B). Subdivision (A) applies when a landlord offers accommodations for rent within two years of filing a notice of intention to remove a unit from rental housing use. Under such circumstances, tenants must be offered the opportunity to re-rent before the accommodations are offered to others for rent, and are entitled to additional protections. The landlord is liable for actual and exemplary damages, and the displaced tenant is not precluded from pursuing any alternative remedy under the

12

## *Standards of Review*

### <u>Bench Trial</u>

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo.  [Citation.]  We apply a substantial evidence standard of review to the trial court's findings of fact.  [Citation.]  Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.  [Citation.]

"A single witness's testimony may constitute substantial evidence to support a finding.  [Citation.]  It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility.  [Citation.]  'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.'  [Citation.]  Specifically, '[u]nder the doctrine of implied findings, the

---

law.  (LAMC, § 151.25, subd. (A).)  The statute of limitations for bringing a claim under LAMC section 151.27, subdivision (A) is three years, commencing on the date that the notice of intent to withdraw was filed.  (LAMC, § 151.25, subd. (A).)  The date of withdrawal may be extended by one year for persons who have obtained an extension under LAMC section 151.23.  The Ellis Act prohibits further extensions of the date of withdrawal if a landlord further voluntarily extends the tenancy.  (Gov. Code, § 7060.4, subd. (b)(6).)  Because we conclude that Cameron's claims and resulting damages were proven under LAMC section 151.27, subdivision (B) and the financial elder abuse statute (Welf. & Inst. Code, § 15610.30) we do not discuss LAMC section 151.27, subdivision (A) further.

reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' [Citation.]

"When[, as here,] a proper request for a statement of decision has been made, the scope of appellate review may be affected. [Citation.]' . . . [I]f the statement of decision does not resolve a controverted issue or is ambiguous, and the omission or ambiguity was brought to the attention of the trial court, 'it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue.' [Citations.]" (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).)

"'A judgment may not be reversed on appeal . . . unless "after an examination of the entire cause, including the evidence," it appears the error caused a "miscarriage of justice." (Cal. Const., art. VI, § 13.) When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. [Citation.]' [Citation.]" (*Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 146 (*Hasso*).)

## Motion for New Trial

The court may order a new trial on all or part of the issues upon motion of the aggrieved party upon a showing that the ground for the motion materially affected the rights of the moving party. (Code Civ. Proc., § 657.) A motion for new trial may be brought to challenge a judgment, whether based upon fact or law. (*Carney v. Simmonds* (1957) 49 Cal.2d 84, 90.)

14

"The right to a new trial is purely statutory, and a motion for a new trial can be granted only on one of the grounds enumerated in the statute. [Citations.]" (*Fomco, Inc. v. Joe Maggio, Inc.* (1961) 55 Cal.2d 162, 166.) Code of Civil Procedure section 657 identifies "seven grounds for such a motion: (1) 'Irregularity in the proceedings'; (2) 'Misconduct of the jury'; (3) 'Accident or surprise'; (4) 'Newly discovered evidence'; (5) 'Excessive or inadequate damages'; (6) 'Insufficiency of the evidence'; and (7) 'Error in law.'" (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633.)

"'"A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." A trial court has broad discretion in ruling on a new trial motion, and the court's exercise of discretion is accorded great deference on appeal. [Citation.]' [Citation.]" (*Hasso*, *supra*, 227 Cal.App.4th at p. 119.)

### *Surprise/Adequacy of the Complaint*

LOP contends that Cameron did not adequately plead (1) that both causes of action were based on a violation of LAMC section 151.27, (2) that LOP offered to rent the accommodations to anyone else, and (3) that LOP intended to defraud her by sending her the 2018 letter refusing to re-rent to her.

We need not address the adequacy of the pleadings. As the trial court concluded, even if Cameron did not adequately plead

15

her re-rental theory, LOP's contention would fail because it did not object in a timely manner.  "The general and longstanding rule is that a party must recover on the cause of action he has alleged in his complaint and not on another cause of action disclosed by the evidence.  [Citations.]  However, the general rule may yield where a case is tried on the theory that a matter is in issue and evidence is received thereon without objection.  [Citations.]  [¶] """It has long been settled law that where (1) a case is tried on the merits, (2) the issues are thoroughly explored during the course of the trial and (3) the theory of the trial is well known to court and counsel, the fact that the issues were not pleaded does not preclude an adjudication of such litigated issues and a review thereof on appeal.""'  [Citation.]"  (*Pierce v. Pacific Gas & Electric Co.* (1985) 166 Cal.App.3d 68, 78.)

The citation to the record that LOP offers to demonstrate that it objected prior to trial does not support its position.  Before trial, counsel for Cameron objected to LOP's argument that the Ellis Act preempted the LAMC, which LOP had not asserted in its answer.  LOP's counsel responded that the complaint did not allege the LAMC imposed a requirement that a party wishing to withdraw a unit from the rental market under the Ellis Act must do so in good faith, although Cameron made the argument in her trial brief.  LOP's counsel argued that if Cameron could argue that the LAMC required good faith removal of housing from the rental market, he should be permitted to argue that the Ellis Act preempted LAMC section 151.09's good faith requirement.  LOP did not object to Cameron's theory that LOP violated the Ellis Act and the LAMC by refusing to re-rent to her and then renting her apartment to Henry.

16

In her opening statement, Cameron's counsel argued that LOP removed her apartment from the rental market and evicted Cameron in bad faith in 2016, and that LOP refused to offer Cameron the option of re-renting her apartment in 2018 in violation of the LAMC and the Ellis Act. LOP did not object to these statements. LOP also made no attempt prior to trial to exclude testimony regarding Henry's use of the property, and when Cameron's counsel questioned Padgett regarding Henry, LOP's counsel did not object.

In its summation brief, LOP made the *reverse* of the argument that it makes now, claiming that Cameron's complaint alleged wrongful eviction and financial elder abuse based on LOP's refusal to re-rent to her in 2018, but *not* on LOP's bad faith eviction of Cameron in 2016.

LOP changed course after the trial court found that LOP did not initially go out of the rental business in bad faith, but found in Cameron's favor on both causes of action on the basis of LOP's refusal to re-rent. LOP argued in its motion for new trial (and argues now on appeal) that it was surprised by the theory that it was liable for its wrongful refusal to re-rent to Cameron in 2018, and requested that the trial court reopen proceedings to allow it to raise new defenses and present evidence in support of those defenses.

"'[T]he question of the sufficiency of the complaint to support the findings and judgment in any given case cannot be raised or reviewed upon an appeal from an order denying a motion for a new trial.' [Citation.]" (*Pemberton v. Barber* (1962) 199 Cal.App.2d 534, 540.) Regardless, "[i]t is well settled that a party's right to a new trial upon the ground of surprise is waived if the alleged surprise is not called to the court's attention by a

17

motion for a continuance or other relief. [Citations.] The rule finds its justification upon essentially practical and equitable considerations: it would be intolerable, in such cases, to permit parties to proceed without objection or application for relief, speculate as to the rulings of the court, and then after an unfavorable decision, predicate a claim of surprise upon a ground which could have been obviated in the first instance had timely objection been made. Moreover, the failure to object tends strongly to indicate that the party has not, in fact, been misled." (*Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 742–743.)

The record demonstrates that LOP was not misled. The trial court did not abuse its discretion by denying LOP's motion for new trial on this basis. Having argued that refusal to re-rent was the *only* theory of recovery for wrongful eviction pleaded in the complaint in its summation brief, LOP cannot contend that it was unfairly surprised or that the cause of action was inadequately pleaded.[4]

### *Substantial Evidence Supports the Finding That LOP Re-Rented to Henry*

LOP further argues that the evidence is insufficient to demonstrate that it had a duty to re-rent to Cameron because there was no evidence that LOP returned her apartment to the rental market within five years of withdrawal. Cameron argues

---

[4] In briefing on its motion to expunge a *lis pendens* Cameron recorded prior to trial, LOP argued that its refusal to re-rent to Cameron did not create a property interest, which further undermines any argument that it was surprised by the re-rental theory.

that LOP has waived this, and all other arguments based on the sufficiency of the evidence, by presenting only the facts favorable to its position. Cameron's argument is not without support. LOP purports to "present a comprehensive review of the record to assist the court with the 'whole record' review necessary to determine the sufficiency of the evidence and whether there is clear and convincing evidence to support punitive damages." In fact, in its statement of facts, LOP argues the facts that are favorable to it to the exclusion of facts favorable to Cameron. It also includes "facts" based on evidence that the trial court excluded. "Facts" do not include excluded evidence. "'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient*. [Citation.]' [Citation.] Where a party presents only facts and inferences favorable to his or her position, 'the contention that the findings are not supported by substantial evidence may be deemed waived.' [Citation.]" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.)

Even absent this significant defect in LOP's appellate briefing, LOP's contention is belied by the record. Padgett testified that Las Orchidias was under construction from 2014 through 2019, and he "had [Roger Henry] staying at the building throughout that time." Henry "did stay at different units at different times." Henry "stayed in all of the units, so [Cameron's apartment] would have been one of them." Padgett testified that he did not compensate Henry for his services, but instead "allowed him use of the property." Padgett explained that Henry was a "fine artist" and used the apartments to work on his art. Leases for two other Las Orchidias units executed in January

19

2019 stated that Henry was authorized to manage Las Orchidias and listed his address as 6907 Bonita Terrace, Cameron's former apartment. The trial court found that Cameron's apartment was re-rented based on the leases and Padgett's testimony that Henry lived in her apartment at various times and was not otherwise compensated for his managerial services. The court found that Padgett's attempts to limit this testimony were not credible. LOP's insistence that other evidence adduced at trial demonstrates that Henry did not rent Cameron's apartment is an attempt to have us re-weigh the evidence, which we will not do. Substantial evidence supports the trial court's finding that LOP rented Cameron's apartment to Henry within five years after it was removed from rental use.

LOP cites to *Santa Monica Rent Control Bd. v. Bluvshtein* (1991) 230 Cal.App.3d 308 (*Santa Monica Rent Control Bd.*), in support of its argument that Henry could not have "re-rented" Cameron's apartment from LOP because there was no landlord/tenant relationship between them. In that case, the defendants were sued individually and as partners in a general partnership. (*Id*. at p. 312.) The defendants purchased the property as joint tenants or tenants in common, invoked their rights to cease operating the property as a residential rental property under the Ellis Act, evicted the tenants, and occupied the units of the property themselves pursuant to an oral agreement. (*Id*. at p. 315.) Under the oral agreement, "[defendants] occupied various units at the subject property as their personal residence" and "each [defendant] granted to the other [defendants] a terminable right of exclusive possession of said unit in consideration for each occupant's contribution of a

sum of money toward purchase and ongoing maintenance of the property." (*Id.* at p. 312.)

The trial court sustained the defendants' demurrer without leave to amend. It found that the complaint did not allege a violation of the Ellis Act because the plaintiff failed to allege a landlord/tenant relationship. (*Santa Monica Rent Control Bd.*, *supra*, 230 Cal.App.3d at p. 16.) On appeal, the appellate court agreed, concluding that the complaint failed to allege that the general partnership owned the property and did not designate the parties as landlord and tenant. (*Id.* at p. 317.) Additionally, the oral agreement was not an agreement to pay "rent," which is "'the consideration paid by the tenant for the use, possession and enjoyment of the demised premises.' [Citation.]" (*Ibid.*) "[T]he payments to be made were for the mortgage and maintenance of the property, not for use and possession. . . ." (*Ibid.*)

No such circumstances exist here. Cameron's complaint clearly identifies LOP as the landlord, and alleges that she was harmed because LOP refused to re-rent her apartment to her because it intended to rent the apartment to someone else. Henry's identity was revealed in discovery, and the case was tried without objection on the theory that Henry rented Cameron's apartment from LOP. In consideration for the use, possession, and enjoyment of the property, Henry provided services as a manager and security presence.

LOP's reliance on *Chan v. Antepenko* (1988) 203 Cal.App.3d Supp. 21 (*Chan*), fares no better. In *Chan*, the owners of an apartment building commenced an unlawful detainer action to recover possession of an apartment from their former employee, who had managed the building. (*Id.* at p. 23.) The Court of Appeal reversed the trial court's judgment denying plaintiffs'

21

motion for judgment on the pleadings and granting the defendant's motion for summary judgment, holding that a San Francisco rent ordinance did not apply to an employee holding over after termination of his employment. (*Ibid*.) "Under his contract of employment [as an assistant manager, the defendant] was entitled to occupy an apartment in the building. Th[at] contract state[d]: 'I acknowledge that I am not a tenant, but am solely an employee dischargeable at any time and that my occupancy of such apt. is merely incidental with (*sic*) said employment and it also may be terminated at any time. . . . [¶] That upon termination of my employment by the owner, for any reason, I will vacate the apt. furnished me within three days.'" (*Ibid*.) The plaintiffs later entered into a second agreement with the defendant, under which he became the manager of the building. (*Ibid*.) "In addition to the provisions of the assistant manager's contract noted above, the manager's contract provided: 'It is also understood that the Undersigned occupied (*sic*) the apt. & garage in the capacity as an employee pursuant to the license granted as agreed.'" (*Ibid*.) The Court of Appeal held the San Francisco rent ordinance, which prohibited a landlord from evicting a tenant absent good cause, did not apply because the former employee was not a tenant as defined under the rent ordinance, but rather a licensee under his contract. (*Id*. at p. 24.)

In this case, we are not interpreting the San Francisco rent ordinance. In its statement of decision, the trial court relied upon LAMC section 151.02, which defines "rent" as "[t]he consideration, including any bonus, benefits or gratuity, demanded or received by a landlord for or in connection with the use or occupancy of a rental unit," to conclude that Henry was

renting Cameron's apartment.[5]  Padgett testified that Henry performed managerial tasks for Las Orchidias, and in exchange was given "use of the property" rather than monetary compensation.  No evidence was presented of a contract between LOP and Henry stating that Henry was a mere licensee.  *Chan* is inapposite.

### *Financial Elder Abuse*

The Legislature enacted the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15610, *et seq*.) (Elder Abuse Act) "'to protect elders by providing enhanced remedies which encourage private, civil enforcement of laws against elder abuse and neglect.' [Citation.]" (*Arace v. Medico Investments, LLC* (2020) 48 Cal.App.5th 977, 981–982 (*Arace*).) "[An] '[e]lder' [is] any person residing in this state, 65 years of age or older." (Welf. & Inst. Code, § 15610.27.)  Welfare and Institutions Code section 15610.30 defines financial elder abuse, which occurs when "a person or entity '[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud' . . . ." ([Welf. & Inst. Code, ] § 15610.30, subd. (a)(1), (2).)" (*Id*. at p. 982.)  "[A] person or entity is 'deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes,

---

[5] The San Francisco rent ordinance defined a "tenant" as: "'A person entitled by written or oral agreement, sub-tenancy approved by the landlord, or by sufferance, to occupy a residential dwelling unit to the exclusion of others.' (§ 37.2(r).)" (*Chan, supra*, 203 Cal.App.3d Supp. at p. 24.)

23

secretes, appropriates, obtains, or retains possession of property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder . . . adult.'" (*Paslay v. State Farm General Ins. Co.* (2016) 248 Cal.App.4th 639, 656.)  A plaintiff is not required to prove bad faith or fraud to prevail on a claim of financial elder abuse.  (*Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 527.)

"When a plaintiff proves 'by a preponderance of the evidence that a defendant is liable for financial abuse, as defined in Section 15610.30, in addition to compensatory damages and all other remedies otherwise provided by law, the court *shall award* to the plaintiff reasonable attorney's fees and costs.'  ([Welf. & Inst. Code, ]§ 15657.5, subd. (a), italics added.)"  (*Arace, supra*, 48 Cal.App.5th at p. 982.)  Welfare and Institutions Code section 15657.5, subdivision (d), permits a plaintiff who has suffered financial elder abuse to seek punitive damages pursuant to Civil Code section 3294.  Civil Code section 3294 provides in subdivision (a): "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

### The Right to Re-Rent Under LAMC Section 151.27 and the Ellis Act is a Property Right within the Meaning of the Elder Abuse Act

LOP argues that Cameron's financial elder abuse cause of action must be reversed because her right to re-rent her

24

apartment under the Ellis Act and LAMC section 151.27 is not a "property right" within the meaning of the elder financial abuse statute.

"The interpretation of state statutes . . . entails a resolution of a pure question of law, which is examined de novo." (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 13, 21.)  "'"[A]s in any case of statutory interpretation, our task is to determine afresh the intent of the Legislature by construing in context the language of the statute." [Citation.]  In determining such intent, we begin with the language of the statute itself.  [Citation.]  That is, we look first to the words the Legislature used, giving them their usual and ordinary meaning.  [Citation.]  "If there is no ambiguity in the language of the statute, 'then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.'"  [Citation.]'"  (*Nguyen v. Western Digital Corp.* (2014) 229 Cal.App.4th 1522, 1544 (*Nguyen*).)  "'In construing a statute, we must also consider "'the object to be achieved and the evil to be prevented by the legislation.'"  [Citation.]'  [Citation.]  We "'avoid a construction that would produce absurd consequences, which we presume the Legislature did not intend.'"  [Citation.]"  (*Ibid.*)

The Legislature promulgated the Elder Abuse Act in the recognition that "elders and dependent adults may be subjected to abuse, neglect, or abandonment and that this state has a responsibility to protect these persons."  (Welf. & Inst. Code, § 15600, subd. (a)).  The Legislature "desire[d] to direct special attention to the needs and problems of elderly persons," who constitute a significant portion of the population and are particularly vulnerable to abuse.  (Welf. & Inst. Code, § 15600,

25

subd. (b).)  The Elder Abuse Act defines abuse broadly, to include "(1) Physical abuse, neglect, abandonment, isolation, abduction, or other treatment with resulting physical harm or pain or mental suffering[;] [¶] (2) The deprivation by a care custodian of goods or services that are necessary to avoid physical harm or mental suffering[;] [¶] [and] (3) Financial abuse . . ." (Welf. & Inst. Code, § 15610.07, subd. (a).)  As part of a comprehensive scheme of protection for elders and dependent adults, separate sections within the Elder Abuse Act define neglect (§ 15610.57), physical abuse (§ 15610.63), and financial abuse (§ 15610.30).

Under the financial elder abuse statute, "a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder or dependent adult." (Welf. & Inst. Code, § 15610.30, subd. (c).) "[S]ection 15610.30, subdivision (c) . . . broadly defines financial abuse of an elder to include the wrongful deprivation of '*any property right*.'  The dependent clause that ends section 15610.30, subdivision (c) is . . . naturally read as expanding or emphasizing the breadth of the category." (*Ring v. Harmon* (2021) 72 Cal.App.5th 844, 854, italics added.)

"The concept of property in California is extremely broad." (*Estate of Sigourney* (2001) 93 Cal.App.4th 593, 603.)  "It has long been recognized that the word 'property' is a term with multiple meanings.  [Citation.]  'Sometimes [the word] is employed to indicate the physical object to which various legal rights, privileges, etc., relate[— ]. . . the physical parcel of land in question.  Other times it refers to the 'complex aggregate of rights

(or claims), privileges, powers, and immunities' that one has in that parcel of land.  [Citation.]"  (*Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 157.)  "'[T]he word "property" may be properly used to signify any valuable right or interest protected by law.  But the meaning to be given to the word depends upon the sense in which it is used, as gathered from the context and the nature of the things which it was intended to refer to and include.'"  (*Fields v. Michael* (1949) 91 Cal.App.2d 443, 449–450 (*Fields*) quoting *Franklin v. Franklin* (1945) 67 Cal.App.2d 717, 725.)

In light of the breadth of the protections afforded to elders by the Elder Abuse Act and California's expansive construction of the term "property," it is clear that the Legislature intended "property" in the financial elder abuse statute to encompass interests that do not involve harms to one's person—which are addressed under separate provisions of the Elder Abuse Act—i.e., "any valuable right or interest protected by law."  (*Fields*, *supra*, 91 Cal.App.2d at p. 449.)  We hold that "property" as used in the Elder Abuse Act includes a displaced tenant's right to re-rent under the LAMC and the Ellis Act.

We are not otherwise persuaded by *Cunningham v. Universal Underwriters* (2002) 98 Cal.App.4th 1141 (*Cunningham*), upon which LOP relies.  *Cunningham* addressed whether an insurer had a duty to defend an insured landlord for failure to deliver premises to a tenant under a property damage provision in an insurance policy that "covered only those claims alleging 'damage to or loss of use of *tangible* property.'"  (*Id*. at p. 1155.)  The Court of Appeal held interference with a tenant's right to possession was not covered by the policy because it was an intangible property right.  (*Ibid*.)  In so holding, the appellate

27

court explained: "A tenant's right to possess property on the lease commencement date is a contractual right that does not mature into a property right until possession actually occurs. A landlord's failure to deliver possession of the premises merely gives the tenant a right to abandon the tenancy and sue for damages. . . ." (*Id.* at pp. 1155–1156.)

As we have discussed, the term "property" has different meanings in different contexts, and in the context of the financial elder abuse statute, we interpret "property" to encompass intangible rights that an insurance policy provision for physical damage to property does not. Additionally, Cameron's right to re-rent her apartment differs from a tenant's right to possess property on the lease commencement date. Cameron's right does not arise through private contract; it is statutory. Whereas the tenant in *Cunningham* had never been in possession of the property, Cameron lived in her apartment for 52 years before she was divested of possession pursuant to the Ellis Act. LOP was permitted to evict tenants under the Ellis Act and the LAMC on the condition that it intended to withdraw their units from rental use. However, if that eviction turned out to be unwarranted— i.e., LOP returned Cameron's apartment to the rental market within five years, as occurred here—the Ellis Act and the LAMC restored to Cameron, as a displaced tenant, the right to possess her apartment, and required LOP to first offer to rent her apartment to her. Following an Ellis Act eviction, the right to possession matures, at the latest, when the property is again offered for rent.[6]

---

[6] For similar reasons, we reject LOP's argument that Cameron lost her right to re-rent her apartment when she agreed

28

We reject LOP's attempts to characterize the property right at issue under LAMC section 151.27, subdivision (B) as "the right to lower rent" (although Cameron was entitled to that as well) or the right to recover a statutory penalty (to which she was also entitled). LAMC section 151.27, subdivision (B), provides that the landlord "*shall* first offer to rent or lease each unit to the tenant or tenants displaced from that accommodation by the withdrawal." (Italics added.) The right Cameron asserts is the right to be first offered to rent or lease her apartment. This necessarily encompassed the right to possess her apartment once Cameron expressed an intent to re-rent—the right to be given an offer that can simply be refused by the offeror despite acceptance would be meaningless, and we will not interpret the Legislature's chosen language in a manner that is absurd. (See *Nguyen*, *supra*, 229 Cal.App.4th at p. 1544.) Finally, we reject LOP's argument that Cameron's right to possession of her apartment was merely contingent because her apartment was not re-rented; we have already concluded that substantial evidence supports the trial court's finding that Cameron's apartment was rented to Henry.

---

to the stipulated judgment in the unlawful detainer case Las Orchidias filed in 2016, *Las Orchidias Properties, LLC v. Cameron*, Los Angeles County Case No. 16U03535. That stipulated judgment states that Cameron's "rights under lease or rental agreement are forfeited" and that LOP is "awarded possession of the premises located at . . . 6907 Bonita Terrace." The stipulated judgment did not address Cameron's rights under the LAMC and the Ellis Act and, as the trial court observed, there is no evidence that Cameron knowingly and voluntarily relinquished her *statutory* right to re-rent her apartment. We also reject the argument that Cameron forfeited damages on this basis, and we do not discuss the issue further in the section of our opinion that addresses damages.

**<u>Substantial Evidence Supports the Finding that LOP Had Fraudulent Intent and Knew Its Refusal to Re-Rent was Wrong or Harmful to Cameron</u>**

LOP next contends that there is insufficient evidence that it took Cameron's property "for a wrongful use or with the intent to defraud" within the meaning of Welfare and Institutions Code section 15610.30. To support this contention, LOP relies on alleged evidentiary errors made by the trial court, and re-argues points that we have already rejected regarding the weight that should be afforded to certain evidence. With respect to the alleged trial errors, LOP argues that "the trial court improperly relied on hearsay and a letter subject to the litigation privilege to find malice and fraud, while refusing to consider material evidence that would have shown that LOP did not violate and had no intent to violate the law." The contention is without merit.

*Admission of Jacobs's Work Log*

LOP first argues that the court abused its discretion when it relied on prejudicial hearsay contained in a work log attributed to the Department's representative, Jacobs, that was not admitted into evidence, as well as Padgett's testimony about the work log.

"Hearsay is an out-of-court statement offered to prove the truth of its content." (*People v. Valencia* (2021) 11 Cal.5th 818, 831; see Evid. Code, § 1200, subd. (a).) "Hearsay is generally inadmissible unless it falls under an exception." (*People v.*

*Sanchez* (2016) 63 Cal.4th 665, 674; see Evid. Code, § 1200, subd. (b).) We review a trial court's evidentiary rulings, including "its determination of issues concerning the hearsay rule," for an abuse of discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 590.)

First, LOP has waived this challenge by failing to object at trial. Although it claims to have timely objected, LOP's citation to the reporter's transcript reveals that counsel objected to specific portions of Cameron's testimony only. After Cameron described at length a phone conversation she had with Jacobs, including statements that Jacobs made to her, LOP's counsel stated: "Your honor, object. Move to strike. Nonresponsive. Also, in a more specific manner, move to strike all the hearsay statements by the person referred to as Mr. Jacobs." When the trial court asked if counsel had any more objections to an exhibit, about which Cameron had been testifying, counsel responded, "Your honor, my objections are to Miss Cameron's testimony." The record demonstrates that counsel's objection was directed at specific testimony by Cameron: he requested striking portions of her testimony only, and did not make a general objection to other, unidentified testimony about the log. LOP's counsel did not object to portions of the work log being read into the record or to Padgett's testimony about the work log. When Cameron's counsel later determined not to call Jacobs as a witness, the parties and the court agreed that the work log would not be admitted into evidence. There was no discussion of Padgett's testimony relating to statements in the work log and no objection to that testimony. "[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 (*In re S.B.*).) That was the case here.

31

Regardless, the work log itself was not admitted. Padgett testified that he recalled talking to Jacobs, but stated that he believed Jacobs's interpretation of the Ellis Act was incorrect. Padgett's conversations with Jacobs did not affect his decision to send Cameron the letter refusing to re-rent to her and the accompanying check. The trial court expressly stated in the statement of decision that it did not consider Padgett's testimony regarding Jacobs's advisements for the truth of the matter asserted, but rather as evidence of Padgett's state of mind under Evidence Code section 1250.[7] "[A] statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay. It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind." (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389.) Padgett's testimony was admissible to demonstrate that, whether Jacobs's assertions were correct or incorrect, Padgett disregarded Jacobs's warnings when he sent the letter and check to Cameron. The testimony is non-hearsay offered to prove Padgett's state of mind.

Finally, LOP cannot show that it suffered prejudice. The Notice of Intent to Re-Rent Withdrawn Accommodations that

_____

[7] LOP's counsel admitted that the exception applied in the second phase of the trial when he sought to admit Padgett's testimony that Jacobs had advised him that what he ultimately did was legal: ". . . I don't believe that conversations that the managers of [LOP] had with the city officials is hearsay in the sense that we're not trying to prove the truth of the matter asserted. We are trying to show the state of mind of the individuals. They were advised that certain things would be legal if done in a certain way. . . ."

32

LOP filed with the Department clearly set forth in a section entitled "Restrictions for Re-Rental for Ellis Act Provisions" that when a property is returned to the rental market within five years of the date of withdrawal, the landlord must first offer the unit to the displaced tenant. The Notice of Intent to Re-Rent Withdrawn Accommodations does not state that a landlord may avoid renting to a displaced tenant by paying six months' rent instead. Padgett and Howell both signed the Notice of Intent to Re-Rent Withdrawn Accommodations and declared that they were "aware of the restrictions pertaining to the re-rental of the withdrawn accommodations as set forth in LAMC § 151.22 et seq. and as summarized above." Padgett testified "My understanding is that, with the housing department regulations, that the prior tenant has 30 days to respond to say that they request to return to their unit." Jacobs's letter informing LOP that it had a legal duty to first offer a unit to a displaced tenant if it offered the accommodations for rent within 10 years from the date of withdrawal was also admitted into evidence. The letter also did not suggest that a landlord could avoid this obligation by paying the displaced tenant six months' rent. LOP's letter clearly stated that LOP was not offering to re-rent Cameron's former apartment to her and enclosed a check for damages. This evidence supports the conclusion that Jacobs and the Department informed LOP of its obligations and LOP determined not to comply.

*Admission of the Refusal to Re-Rent Letter*

LOP also forfeited its argument that the letter was privileged. (See *In re S.B.*, *supra*, 32 Cal.4th at p. 1293 [appellate court may hold that an issue is forfeited if not timely raised].)

33

When the letter was admitted into evidence at trial, the court asked LOP's counsel if he had any objections. Counsel responded, "I have no objection to the document." Counsel did not raise the issue of privilege until after the liability phase of the trial had concluded and the trial court had found that Cameron established malice and fraud. LOP first sought to assert the defense that the letter was privileged as an offer of compromise in a late-filed brief, which the trial court struck because the brief was filed without permission.[8]

Even if LOP had not forfeited its challenge to the letter, the letter was admissible as a party admission. Although letters offering settlement may be privileged, party admissions are not. (*Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1493–1495.) "'In considering whether a person's statement amounts to an ordinary admission or constitutes an offer of compromise, the intention of the party is dispositive.' [Citation.] If the statement was not intended as a concession but as an assertion of ""all that he deemed himself entitled to,"" it is not an offer of compromise. [Citation.]" (*Id.* at p. 1494.) Here, Padgett's own testimony demonstrates that the letter was an admission. He responded in the affirmative when he was asked whether "that payment [was] an admission" that he had "violated [Cameron's] right to come back to her unit." Moreover, the language of the letter offered no compromise—LOP flatly refused Cameron's request to re-rent the apartment and tendered a check to Cameron in the amount that LOP decided she was due under the Ellis Act. The letter was an assertion of

---

[8] We conclude that LOP forfeited its "reliance on counsel" argument for the same reasons.

all that LOP deemed itself entitled to and was therefore admissible as an admission.

*Exclusion of Evidence Supporting LOP's Theories of Defense*

LOP challenges the trial court's exclusion of evidence relating to its arguments that (1) the letter refusing to re-rent should have been excluded under the litigation privilege; (2) LOP simply misunderstood the law regarding re-rental and had no intent to defraud Cameron; (3) LOP was following the advice of counsel; (4) LOP followed Jacobs's advice; (5) LOP never re-rented Cameron's apartment; and (6) LOP never intended to re-rent Cameron's apartment. We reject these contentions. All of the evidence at issue was relevant to liability, and its admission should have been sought in the first phase of trial. Instead, LOP first sought to admit the evidence in a late-filed brief that was submitted after the liability phase of the trial had concluded. The trial court struck the brief, which was filed without the court's permission. LOP's argument that this evidence was improperly excluded is forfeited on appeal. (See *In re S.B.*, *supra*, 32 Cal.4th at p. 1293.)

LOP further argues that the trial court abused its discretion by refusing to reopen proceedings for this evidence to be considered. "'"To be entitled to relief on appeal from the result of an alleged abuse of discretion it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice . . . ." [Citation.]' [Citation.]" (*Estate of Young* (2008) 160 Cal.App.4th 62, 82.) That is not the case here. As we have discussed, LOP was not unfairly surprised

by Cameron's claims.  LOP had an entire trial to present the evidence at issue but did not seek to do so until it had already lost its case.  There is no manifest injustice in the trial court's refusal to afford LOP the equivalent of a second trial.

*Substantial Evidence of "Wrongful Use" and "Intent to Defraud"*

LOP argues the evidence was insufficient to show that it took Cameron's property "for a wrongful use or with the intent to defraud" because it was unclear whether the Ellis Act permitted landlords to avoid the obligation of offering displaced tenants the opportunity to re-rent by paying them the equivalent of six months' rent.  (Welf. & Inst. Code, § 15610.30, subd. (a)(1).)  The contention is without merit.

At the time that LOP placed Cameron's apartment back on the rental market, the language of the Ellis Act and LAMC section 151.27, subdivision (B), which implemented the Act, were unambiguous:

"[A]n owner who offers accommodations again for rent or lease within a period not exceeding 10 years from the date on which they are withdrawn, and which are subject to this subdivision, *shall* first offer the unit to the tenant or lessee displaced from that unit by the withdrawal, if that tenant or lessee requests the offer in writing within 30 days after the owner has notified the public entity of an intention to offer the accommodations again for residential rent or lease pursuant to a requirement adopted by the public entity under subdivision (c) of Section 7060.4.  The owner of the accommodations *shall* be liable to any tenant or lessee who was displaced by that action for

36

failure to comply with this paragraph, for punitive damages in an amount which does not exceed the contract rent for six months." (Gov. Code, § 7060.2, subd. (c), italics added.)

Merriam Webster defines "shall" as "used in laws, regulations, or directives to express what is mandatory." (Merriam-Webster's Unabridged Dict. (2022) <https://unabridged.merriam-webster.com/unabridged/shall> [as of Aug. 17, 2022], archived at <https://perma.cc/UQF2-ZETE>.) Common principles of statutory interpretation similarly establish that, absent evidence to the contrary, "shall" is directive or mandatory. (*People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 194 [the word "shall" is ordinarily construed as mandatory, unless such a construction would imply an unreasonable legislative purpose].) In contrast, the word "may" grants permissive or discretionary authority. (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1143 [the word "'may'" is ordinarily deemed permissive].)

The Ellis Act did not provide that a landlord "may" first offer a unit to a displaced tenant or "may" be liable to the displaced tenant for punitive damages. If a unit was taken off the rental market and then re-offered for rent, both a first offer and punitive damages were mandatory and the courts interpreted these obligations as such. (See *Coyne v. De Leo* (2018) 26 Cal.App.5th 801, 815–816, italics added (*Coyne*) ["If the landlord offers the previously withdrawn rental units for rent within five years of their withdrawal, the landlord must offer the unit for rent or lease to the displaced tenant at the previous rental plus intervening annual adjustments, *and* the landlord is liable to the displaced tenant for punitive damages (not to exceed

37

six months' rent) for failure to offer the rental to the displaced tenant"].)[9] Had the Legislature intended it to be otherwise, it could have stated that a landlord who did not wish to first offer the unit to a displaced tenant could instead pay the displaced tenant six months' rent. It did not.

We are not otherwise persuaded by LOP's argument that the Legislature's amendment to Government Code section 7060.2, subdivision (c) in 2020, which added the phrase "and the payment of which shall not *be construed to* extinguish the owner's obligation to comply with this subdivision," was intended as a substantive change in the law. (Assembly Bill No. 1399 (Stats. 2019–2020, Ch. 596, § 1, italics added).) A change in the substantive law would have only required the modification "and the payment of which shall not . . . extinguish the owner's obligation to comply with this subdivision." (Gov. Code, §7060.2, subd. (c).) The Legislature also included the words "be construed to." We give significance to every word of a statutory provision, where possible. (*People v. Arias* (2008) 45 Cal.4th 169, 180.) "'[A] construction that renders a word surplusage should be avoided. [Citations.]'" (*Ibid.*) Here, the use of the words "be construed to" in the amended statute indicate that the Legislature's intent was unchanged; it amended the statute to prevent landlords from *construing* it in an incorrect manner to the detriment of displaced tenants.

The evidence showed that LOP took Cameron's property for a wrongful use and with the intent to defraud. LOP knew that Cameron was elderly and had lived in her apartment for over 50

---

[9] *Coyne, supra*, 26 Cal.App.5th 801, was issued on July 30, 2018, before LOP sent the letter to Cameron refusing to rent to her.

years. LOP also knew that Cameron would do whatever was in her power to stay in the home that she loved—whether by exercising a statutory right or over-staying her lease. LOP was aware of the law and regulations that required it to offer to re-rent the apartment to Cameron; however, LOP did not want to rent to her because it did not believe that Cameron would vacate her apartment when asked, and LOP wanted to be able to deliver Las Orchidias unoccupied, which would result in a larger return on its investment. Padgett testified that he did not feel that Cameron's right to return "would trump what [LOP's] plans were for the development." He conceded in testimony that payment of six months' rent was an admission that LOP had violated Cameron's right to return. Padgett was not deterred by Jacobs's warnings. Howell, for his part, testified that, based on online research and conversations at dinner parties, it was his understanding that Cameron was only entitled to the statutory penalty. The wording of LOP's letter suggests, as the trial court observed, that LOP had the option not to re-rent to Cameron if it did not wish to, and that six months' rent was all she could recover under the law. It was reasonable for the trial court to infer that LOP sent the letter and check despite the fact that LOP knew this was not the law, and that LOP intended for Cameron to believe it was acting lawfully, to her detriment. Substantial evidence supports the trial court's findings that LOP took Cameron's property for a wrongful use, did so with fraudulent intent, and did so with full knowledge of the harm that it would cause to Cameron.

39

***Damages Are Not Limited by LAMC Section 151.27,***
***Subdivision (B)***

With respect to damages, LOP first argues that even if this court concludes that it violated LAMC section 151.27, subdivision (B), Cameron's damages are limited to punitive damages in the amount of six months' rent under that section. This is incorrect. As the trial court observed, if Cameron only sought relief under LAMC section 151.27, subdivision (B), her damages may have been so limited,[10] however, "since we have an elder abuse claim here, [Cameron] is entitled to heightened remedies because the Court has found clear and convincing evidence of fraud."

LOP's reliance on *De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890 (*De Anza Santa Cruz Mobile Estates Homeowners Assn.*) and *Turnbull & Turnbull v. ARA Transportation, Inc.* (1990) 219 Cal.App.3d 811 (*Turnbull & Turnbull*) is misplaced. Those cases stand for the proposition that a plaintiff may not be awarded double recovery based on the same conduct. They do not hold that trial courts are bound to impose damages under one statute over another in cases like Cameron's. *De Anza Santa Cruz Mobile Estates Homeowners Assn.* holds that although trial courts may not impose both statutory penalties and punitive damages, a plaintiff may proceed on two theories of recovery, either of which may be the basis for an award of damages following trial. (*De Anza Santa Cruz Mobile Estates Homeowners Assn.*, *supra*, 94 Cal.App.4th at

---

[10] We need not decide whether LAMC section 151.27, subdivision (B), limits the damages that Cameron can recover, and we decline to do so.

40

p. 907.) *Turnbull & Turnbull* holds that, although double recovery is prohibited if a penalty and punitive damages share the same purpose, "[w]here a statutory penalty is imposed for a wrongful act, it does not preclude recovery of punitive damages in a tort action where the necessary malice or oppression is shown." (*Turnbull & Turnbull, supra,* 219 Cal.App.3d at p. 826.)

Here, the damages award is consistent with both *De Anza Santa Cruz Mobile Estates Homeowners Assn.* and *Turnbull & Turnbull.* Cameron proceeded on two causes of action and was awarded damages under the financial elder abuse statute.[11]

### *Substantial Evidence Supports the Trial Court's Award of Damages*

LOP makes several arguments regarding the amount of damages imposed, which we reject in turn. The amount of damages to award is a question of fact. (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 299 (*Bigler-Engler*).) "'An

---

[11] The courts of appeal have reached differing views as to whether the financial elder abuse statute creates an independent cause of action or a mechanism for imposing attorney fees, costs, and damages based on other causes of action. (See *Perlin v. Fountain View Management, Inc.* (2008) 163 Cal.App.4th 657, 666 [elder abuse constitutes an independent cause of action]; *Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 529 [Elder Abuse Act does not create a cause of action, but provides for attorney fees, costs, and heightened damages under certain conditions].) Cameron asserts that the financial elder abuse statute creates an independent cause of action. Because LOP does not challenge this assertion, we assume, without deciding, that Cameron has pleaded an elder abuse cause of action in the proper form.

appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the [fact finder].' [Citation.] '"The question is not what this court would have awarded as the trier of fact, but whether this court can say that the award is so high as to suggest passion or prejudice."' [Citation.]" (*Ibid*.) '"In making this assessment, the court may consider, in addition to the amount of the award, indications in the record that the fact finder was influenced by improper considerations.' [Citation.]" (*Ibid*.) '"There are no fixed or absolute standards by which an appellate court can measure in monetary terms the extent of the damages suffered by a plaintiff as a result of the wrongful act of the defendant. The duty of an appellate court is to uphold the jury and trial judge whenever possible. [Citation.] The amount to be awarded is "a matter on which there legitimately may be a wide difference of opinion" [citation].' [Citation.]" (*Id*. at pp. 299–300.) "We review [a] damages award for substantial evidence . . . 'In considering the contention that the damages are excessive the appellate court must determine every conflict in the evidence in respondent's favor, and must give [her] the benefit of every inference reasonably to be drawn from the record [citation].' [Citation.]" (*Id*. at p. 300.)

### **Non-Economic Damages**

LOP argues that the trial court's award of damages for emotional distress cannot stand because it was based on Cameron's 2016 eviction, which the court found was not

42

unlawful, rather than LOP's refusal to re-rent to Cameron in 2018.

The statement of decision expressly states that non-economic damages were awarded to compensate Cameron for the emotional harm she suffered and would continue to suffer resulting from LOP's refusal to re-rent to her in 2018. The trial court specifically agreed with LOP that Cameron could not recover damages for the earlier eviction. The court discussed the events that occurred prior to LOP's refusal to re-rent to Cameron to illustrate that LOP's denial of her right to return was "particularly cruel in light of the history between the parties." It did not base the award on those prior events.

LOP further argues that the evidence of Cameron's emotional distress was insufficient to support the damages awarded. We reject this argument as well. "The difficulty inherent in assessing damages is plainly evident when noneconomic damages . . . are at issue . . . [Citation.]" (*Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 300.) "'"No method is available to the [trier of fact] by which it can objectively evaluate such damages, and no witness may express his subjective opinion on the matter. [Citation.] In a very real sense, the [trier of fact] is asked to evaluate in terms of money a detriment for which monetary compensation cannot be ascertained with any demonstrable accuracy."' [Citations.]" (*Ibid*.)

Substantial evidence supports the trial court's award. Under the circumstances, we cannot say the award is so high as to suggest passion or prejudice. Evidence was presented that Cameron lived in her apartment for 52 years. She was very attached to it, did not want to leave, and was upset by her eviction. In light of these facts, she was emotionally distressed

when, after being overjoyed at the prospect of returning to her home, LOP flatly denied her right to do so, dashing her long-held hopes.  Cameron described feeling sick, as if she had been punched in the stomach.  The trial court observed her demeanor when she testified about receiving the letter, and reasonably inferred that her emotional distress over the incident was ongoing.  The factors that would influence the trial court's award, including Cameron's advanced age and vulnerability, are the precise factors that the Legislature decided should be considered when there is a claim of financial elder abuse.  There is no basis to overturn the award for non-economic damages.

### **Punitive Damages**

*Clear and Convincing Evidence of Malice or Fraud*

"In a civil case not arising from the breach of a contractual obligation, [the fact finder] may award punitive damages 'where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.'  (Civ. Code, § 3294, subd. (a).)"  (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712 (*Roby*).)  Welfare and Institutions Code section 15657.5 permits imposition of punitive damages under Civil Code section 3294.  (Welf. & Inst. Code, § 15657.5, subd. (d).)

"'Malice'" is defined as intentional injury or "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  (Civ. Code, § 3294, subd. (c)(1).)  "'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the

44

defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(3).)

LOP argues that there is not clear and convincing evidence of malice or fraud that would support the trial court's award of punitive damages. LOP asserts that "[t]o amount to clear and convincing evidence justifying punitive damages, evidence must be *inconsistent with* any explanation other than LOP's malice or conscious disregard of Ms. Cameron's health or safety. (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1288, fn. 14 (*Tomaselli*).)"

This is a gross misstatement of *Tomaselli* and the law. *Tomaselli* states: "'[P]unitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather *some evidence* should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing.'" (*Tomaselli, supra*, 25 Cal.App.4th at p. 1288, fn. 14, italics added.)

Our Supreme Court has described the standard of review as follows: "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the

45

credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

Here, the evidence is not merely consistent with the conclusion that LOP was acting with malice, fraud, gross negligence or oppressiveness—it is inconsistent with the conclusion that LOP made a mistake of law or fact, an honest error of judgment, was overzealous, merely negligent, or suffered from some other noniniquitous human failing. LOP refused to rent to Cameron although it knew that it was required to, and knew that refusing to rent to her would cause her emotional distress, because by doing so LOP could increase its profits. To accomplish this goal, LOP represented to Cameron that it had the right to refuse to rent to her and that she had no recourse other than to accept the damages in the amount of six months' rent it provided. As the trial court observed, the evidence showed that LOP "was not trying to negotiate a compromise of any claim [Cameron] might have. [LOP] was trying to hood wink [Cameron] into believing [LOP] had the right to deny [Cameron] her right to return and that any damages she could recover for this violation would be limited to $6,649.56." We conclude that, viewing the record in the light most favorable to Cameron, "the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable" that LOP acted with malice and fraud. (*Conservatorship of O.B., supra,* 9 Cal.5th at p. 1011.) Specifically, LOP engaged in despicable conduct with conscious disregard for Cameron's emotional health, and intentionally misrepresented, deceived, and concealed material facts known to it with the intent to deprive Cameron of her right to return to her apartment. LOP's

46

arguments to the contrary are based on an evaluation of the evidence in its own favor and/or an imagined standard of review more favorable to it. We will not afford those arguments further consideration.

*The Punitive Damages Award Does Not Violate Due Process*

LOP argues that the trial court's award of punitive damages was unreasonable because there was no evidence that LOP's behavior was reprehensible or that punishment was required for deterrence. LOP further argues that the Legislature has determined that the reasonable penalty for LOP's actions is damages in the amount of six months' rent.

"The due process clause of the Fourteenth Amendment to the United States Constitution places constraints on state court awards of punitive damages. (See *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–418 (*State Farm*); *BMW of North America v. Gore* (1996) 517 U.S. 559, 568, (*BMW*).) [Our Supreme Court] explained the basis of these constraints: 'The imposition of "grossly excessive or arbitrary" awards is constitutionally prohibited, for due process entitles a tortfeasor to '"fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."' [Citation.]' (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171 (*Simon*).)

"In *State Farm*, the high court articulated 'three guideposts' for courts reviewing punitive damages: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the

47

plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the [fact finder] and the civil penalties authorized or imposed in comparable cases.' (*State Farm*, *supra*, 538 U.S. at p. 418; see also *BMW*, *supra*, 517 U.S. at p. 575.)" (*Roby, supra*, 47 Cal.4th at p. 712.)

"In deciding whether an award of punitive damages is constitutionally excessive under *State Farm* and its predecessors, we are to review the award de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct. [Citations.] This '[e]xacting appellate review' is intended to ensure punitive damages are the product of the ""application of law, rather than a decisionmaker's caprice."" [Citation.]" (*Simon, supra*, 35 Cal.4th at p. 1172, fn. omitted.) "[F]indings of historical fact made in the trial court are still entitled to the ordinary measure of appellate deference[, however]." (*Ibid.*) We accept the underlying facts found by the jury and the court. (*Ibid.*)

"[A] court reviewing [an] award for due process compliance may consider what level of punishment is necessary to vindicate the state's legitimate interests in deterring conduct harmful to state residents . . ." (*Simon, supra*, 35 Cal.4th at p. 1185.) Thus, "the defendant's financial condition [is] a legitimate consideration in setting punitive damages. (See *State Farm*, *supra*, 538 U.S. at p. 428 [use of wealth as a factor not "'unlawful or inappropriate'"].)" (*Ibid.*)

48

<u>Reprehensibility</u>

"Of the three guideposts that the high court outlined in *State Farm*, *supra*, 538 U.S. at page 418, the most important is the degree of reprehensibility of the defendant's conduct. On this question, the high court instructed courts to consider whether '[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.' (*Id.* at p. 419.)" (*Roby*, *supra*, 47 Cal.4th at p. 713.)

Here, almost all of the factors indicating reprehensibility are present. First, LOP's actions caused Cameron both physical and economic harm. (See *Roby*, *supra*, 47 Cal.4th at p. 713 [harm to plaintiff "was 'physical' in the sense that it affected her emotional and mental health, rather than being a purely economic harm"].) Second, LOP's conduct evinced an indifference or reckless disregard for Cameron's health and safety because LOP was aware that its actions would affect her emotional well-being. (See *Ibid.* [conduct evinced an indifference to or a reckless disregard of the health or safety of others where "it was objectively reasonable to assume [defendant's tortious] acts . . . would affect [the plaintiff's] emotional well-being"].) Third, Cameron was financially vulnerable. Cameron testified that the higher rent and storage costs that she had to pay after LOP refused to re-rent to her were barely covered by her social security. Finally, as the trial court found, the harm to Cameron was the result of malice, trickery, and deceit. The overwhelming

49

weight of the evidence demonstrates that LOP's actions were reprehensible.

### Disparity Between Award and Actual Harm

LOP does not argue that there is a disparity between the punitive damages award and the actual harm Cameron suffered, which is unsurprising as a comparison of compensatory and punitive damages reveals a multiplier of less than 1, well below generally accepted ratios. (*State Farm*, *supra*, 538 U.S. at p. 425 [ratios of punitive damages of double, triple, and quadruple compensatory damages, while not binding, are instructive of appropriate awards].)

### Comparable Civil Penalties

We disagree with LOP that LAMC section 151.27, subdivision (B), is a comparable civil penalty that sets the reasonable amount of punitive damages in this case. First, the Legislature created two categories of penalty for refusal to re-rent, which differ based only upon the time that has passed since the accommodations were withdrawn from the rental market. Although a plaintiff is limited to the equivalent of six months' rent in punitive damages under LAMC section 151.27, subdivision (B), when a violation has occurred within two and ten years after withdrawal of the unit from rental use, punitive damages are not limited by the LAMC or the Ellis Act when the violation occurred less than two years after the accommodations are withdrawn pursuant to LAMC section 151.27, subdivision (A). Here, even if we were to assume Cameron's recovery under

50

LAMC section 151.27, subdivision (A), was barred due to the statute of limitations (an issue we do not decide), LOP's *conduct* is more closely comparable to the conduct penalized under that subdivision. The trial court found that LOP re-rented to Henry in less than two years based on Padgett's testimony that Henry lived in all of the units between 2014 and 2019 while construction was ongoing. Padgett's testimony constitutes substantial evidence to support that finding. (*Thompson*, *supra*, 6 Cal.App.5th at p. 981 [testimony of a single witness constitutes substantial evidence].) Accordingly, a punitive damages award of six months' rent is not the comparable civil penalty.

Second, in this case the conduct is not limited to refusing to rent to a displaced tenant—LOP refused to re-rent to a displaced elderly tenant, which is conduct that the Legislature has deemed to be more egregious. The trial court awarded punitive damages under the Elder Abuse Act, which takes the victim's age into account. The statutory penalty imposed under the Ellis Act and the LAMC section 151.27, subdivision (B), is not a suitable yard stick for measuring damages where the landlord has refused to re-rent to an elderly person, whom the Legislature has deemed more vulnerable than others in the population, and it has been shown by clear and convincing evidence that the landlord did so with malice and oppression that is reprehensible. LOP's due process right to notice was not violated by imposition of punitive damages that were appropriate under the Elder Abuse Act.

## LOP's Financial Condition

LOP contends that an award of $250,000 in punitive damages was not necessary given that its net worth was at most

51

$2.6 million.  LOP argues that an award equal to almost 10% of its net worth is "significantly outside 'the norm.'"  The trial court never made a finding of LOP's net worth beyond placing it between $2.6 and $4.6 million and stating that, in either case, a punitive damages award of $250,000 was appropriate.  In the statement of decision, the trial court found that $250,000 in punitive damages was an appropriate amount given the reprehensibility of LOP's actions and the fact that it purchased another apartment building with the $4.6 million in proceeds realized from its sale of Las Orchidias.

We agree.  "In assessing whether a punitive damages award is excessive relative to the defendant's wealth, 'the key question . . . is whether the amount of damages "exceeds the level necessary to properly punish and deter." [Citations.]' [Citation.]" (*Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 78 (*Bankhead*).)  "'Although net worth is the most common measure of the defendant's financial condition, it is not the only measure for determining whether punitive damages are excessive in relation to that condition.  [Citations.]' [Citation.]" (*Id.* at p. 79; see also *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 625 [allowing punitive damages award that "technically exceed[ed]" the wealthy individual defendant's net worth, because the evidence showed that the defendant would not be financially "destroyed by the award"].)  "'Indeed, it is likely that blind adherence to any one standard [of determining wealth] could sometimes result in awards which neither deter nor punish or which deter or punish too much.' [Citation.]" (*Bankhead, supra,* 205 Cal.App.4th at p. 79.)  "'"[N]et worth" is subject to easy manipulation and . . . should not be the only permissible standard.' [Citation.]" (*Ibid.*)

Here, LOP returned four units to the rental market. Two of the displaced tenants could not be contacted. Both of the other displaced tenants—Cameron and Boothby—expressed the desire to return to their homes. In both instances LOP informed the tenants that it would not rent to them and that they were entitled to six months' rent for LOP's violation. LOP negotiated with Boothby to forego his rental rights for the sum of $14,000. In light of the $4.6 million LOP realized for the sale of Las Orchidias delivered vacant, a punitive damages award of six months' rent in this case—less than $7,000—would likely have little deterrent effect. Regardless, even if we were to simply view the award in comparison to LOP's alleged net worth of $2.6 million (an amount which was neither undisputed nor resolved), an award of approximately 9.7% of that amount is not excessive. LOP makes no arguments beyond its assertions that the award is "out of the norm" and that its conduct was not reprehensible. We have already rejected LOP's reprehensibility argument. There is no basis for concluding that the punitive damages award will place such a burden on LOP as to be beyond what it has the ability to pay or the amount that is necessary to deter future misconduct.

In sum, our independent review leads us to conclude that all of the relevant factors weigh in Cameron's favor. The damages award does not violate LOP's due process rights and is not otherwise excessive.

***Attorney Fees and Costs***

With respect to attorney fees and costs, LOP argues only that the award should be reversed because the judgment should

be reversed.  As we do not reverse the judgment, the award of attorney fees and costs stands.

## DISPOSITION

We affirm the trial court's judgment and orders. Respondent Erin Cameron is awarded her costs on appeal.


MOOR, J.


We concur:



RUBIN, P. J.



KIM, J.